IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| LUCA CICALESE, M.D. AND | § | |
| CRISTIANA RASTELLINI, M.D. | § | |
|     Plaintiffs | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:17-cv-67 |
| | § | |
| THE UNIVERSITY OF TEXAS | § | |
| MEDICAL BRANCH, | § | |
|     Defendant | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW, Plaintiffs Luca Cicalese, M.D. and Cristiana Rastellini, M.D., and file this Complaint, complaining of The University of Texas Medical Branch ("Defendant" or "UTMB"), and for their cause of action, show the Court as follows:

## I.
## INTRODUCTION

1.     This action seeks equitable relief, economic damages, compensatory damages, attorneys' fees, expert witness fees, taxable costs of court, and prejudgment and post-judgment interest for UTMB's violations of Title VII.

2.     Plaintiffs allege that they are being subjected to national origin discrimination, as well as retaliation because of their complaints of national origin discrimination, in violation of Title VII.

3.     Plaintiffs demand a jury on all issues triable to a jury.

## II.
## PARTIES

4.     Luca Cicalese is a resident of Harris County, Texas.

5.     Cristiana Rastellini is a resident of Harris County, Texas.

6.      Defendant, The University of Texas Medical Branch at Galveston ("UTMB"), is a component of The University of Texas System and the University of Texas.   UTMB may be served with process herein by serving David L. Callender, the President of The University of Texas Medical Branch at Galveston, Office of the President, University of Texas Medical Branch at Galveston, 301 University Blvd., Suite 6.100 Administration Bldg., Galveston, Texas 77555.

7.      Whenever in this Complaint it is alleged that Defendants committed any act or omission, it is meant that the Defendants' officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendants or was done in the routine normal course and scope of employment of the Defendants' officers, directors, vice-principals, agents, servants, or employees.

### III.
### JURISDICTION AND VENUE

8.      This action is brought pursuant to Title VII, 42 U.S.C. § 2000e, *et seq.* and the Texas Commission on Human Rights Act, codified under the Tex. Lab. Code §§ 21.001 *et seq.*

9.      This Court has subject matter jurisdiction over all claims in this action under 28 U.S.C. §§ 1331 and 1367.

10.     This Court has personal jurisdiction over Defendant since Defendant is actively engaged in business in Texas and in Galveston County, Texas.

11.     Defendant has sufficient minimum contacts with Texas to establish both specific and general jurisdiction over them in Texas.

12.     Venue is proper in Galveston County, Texas, since the substantial part, if not all, of the events or omissions giving rise to Plaintiffs' claims occurred within Galveston County, Texas.

2

## IV.
## PROCEDURAL REQUISITES

13.     On or about December 10, 2015, Plaintiff Luca Cicalese filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission Civil Rights Division ("TWC CRD").

14.     On or about December 10, 2015, Plaintiff Cristiana Rastellini filed a charge of discrimination against Defendant with the EEOC and TWC CRD.

15.     On or after December 5, 2016, the EEOC issued Notice of Right to Sue letters to Plaintiffs in this matter.

16.     This lawsuit has been filed within 90 days of receipt of the Right to Sue letters issued by the EEOC.

17.     All conditions precedent to the filing of this suit have been met.

## V.
## FACTS

**A.     Dr. Cristiana Rastellini**

18.     Dr. Cristiana Rastellini is a citizen of the United States who was born in Italy.

19.     Dr. Rastellini is recognized nationally and internationally for her clinical and scientific impact.

20.     In November 2007, Cristiana Rastellini, M.D. was hired by the University of Texas Medical Branch ("UTMB") as a Professor of Surgery and Medicine in a tenure track position.

21.     In addition, Dr. Rastellini was given the titles of Director of Transplant Research and Director of Cellular Transplantation.

22.     Dr. Rastellini is a leader and pioneer in the field of pancreatic islet transplantation and has made strides developing the first artificial intestine.

23.     During her directorship, Dr. Rastellini opened a new clinical islet transplant program, established a research lab with multiple successful projects, obtained grants and published numerous papers in peer-reviewed journals.

24.     Dr. Rastellini has received numerous awards for her work at UTMB including the election to the "10 most powerful moms in STEM in the US" for her career accomplishments (Dr. Rastellini was among the youngest women to receive a multi-million dollar National Institutes of Health "NIH" grant for clinical islet transplantation while being the mother of 4 children).

25.     Dr. Rastellini has been always considered pleasant, accommodating and successful.

26.     Dr. Rastellini has been highly esteemed by the leadership of the institution, the Galveston/Houston community and her peers for her success and accomplishments, as well as for her integrity.

27.     Dr. Rastellini has multiple collaborations ongoing with many faculties at UTMB and other institutions nationally and internationally.

28.     Dr. Rastellini has always worked very closely with her husband, Dr. Luca Cicalese, with whom she has done numerous projects and clinical trials together, and he was doing his research in the same laboratory space assigned to her for transplant research.

29.     Upon the arrival of the new Dean, Dr. Danny Jacobs, Dr. Rastellini was immediately harassed by Dr. Jacobs because she is Italian.

30.     When they first met, Dr. Jacobs asked Dr. Rastellini and her husband Dr. Cicalese where they were from and when they replied from Italy he told them "What are you doing here? You should go back to Italy."

31.     Dr. Rastellini received positive evaluations at UTMB until Dr. Jacobs arrived.

4

32.     Upon his arrival to UTMB, Dr. Jacobs forced Dr. Rastellini's Chairman to write negative evaluations, such as "does not meet criteria" based "only" on current NIH funding and not on any other criteria.

33.     This was done while Dr. Prough was interim Dean, and he told Dr. Rastellini that he was instructed to do so by Dr. Jacobs prior to his arrival.

34.     When Dr. Rastellini was appointed with the highest Order of Merit of the Italian Republic "Commendatore" (literally translated Knight Commander) by decree of the President of the Republic of Italy for her career accomplishments, her Chairman at the time, Dr. Townsend, and Dr. Cicalese explained to Dr. Jacobs the importance of such recognition.

35.     Although Dr. Jacobs routinely publicly recognizes other faculty members for similar or even lesser accomplishments, Dr. Jacobs did not send any memo recognizing this accomplishment for Dr. Rastellini.

36.     Dr. Jacobs removed Dr. Rastellini from her existing laboratory in building 21 in order to assign it to another investigator.

37.     Dr. Rastellini told Dr. Jacobs that this would disrupt her work and delay her projects with deleterious effects on the graduation schedule of her doctoral (Ph.D.) students and her chance to obtain tenure.

38.     Moreover, other laboratories were vacant and available for the other investigator to use.

39.     In addition, two labs in B21 were supposed to be vacated (Dr. Rastellini's and the one occupied by an American Ph.D.).

40.     However, Dr. Rastellini was ultimately the only one who was asked to move.

41.    Dr. Rastellini was assigned a different laboratory space that was inadequate to conduct their research and they lost the possibility to utilize equipment available to them at the previous location.

42.    Dr. Rastellini was initially promised a more adequate space for their research but that never happened.

43.    After Hurricane Ike, Dr. Rastellini's major collaborator and key element for the success of the islet transplant program was terminated and never replaced.

44.    Although the clinical islet program had low volume (these programs are never high volume), Dr. Rastellini kept collaborating with various groups and using her FDA registered cell isolation lab to conduct research.

45.    Dr. Rastellini was blocked from the lab, and for example, while patients were under evaluation for the procedure, the clinical islet isolation lab had equipment removed twice and without notice. Later it was rendered not usable and became a storage space without informing Dr. Rastellini.

46.    Recently after approving one of the candidates for an islet auto-transplant, Dr. Rastellini requested permission from the administrator of the department of surgery, Barb Petit, to restock and therefore re-activate the clinical facility so that they could proceed with the case.

47.    Dr. Rastellini explained that they were receiving pressure from the patient who wanted the procedure done as soon as possible, as well as the surgeons and coordinators involved.

48.    Ms. Petit informed Dr. Rastellini that "she would have to check and let her know."

49.    Dr. Rastellini has never received any response from Ms. Petit.

50.     In October 2014, Dr. Douglas Tyler was hired as the new chairman of surgery. Dr. Tyler came to UTMB from the same department and institution as the recently hired Dean of Medicine, Dr. Danny Jacobs.

51.     Since his arrival to UTMB, Dr. Tyler has created a hostile environment for Dr. Rastellini and her husband, Dr. Luca Cicalese, because they are Italian.

52.     Immediately after his arrival, Dr. Tyler began to exclude Dr. Rastellini from departmental activities. For example, Dr. Rastellini was not included in a department research task force or in resident candidate interviews that she had been doing on a regular basis prior to Dr. Tyler's arrival.

53.     Dr. Rastellini was also excluded from interviews of transplant faculties that were considered for hiring in the transplant department or even the new Director of Transplant, despite the fact that she was the Director of Transplant Research and Director of Cellular Transplantation.

54.     Dr. Tyler has made derogatory and unlawful comments about Dr. Rastellini and other Italians and has engaged in harassment of her.

55.     He has attacked Dr. Rastellini's accomplishments and the work she has done for UTMB and ultimately he has marginalized Dr. Rastellini.

56.     For example, Dr. Tyler made explicit and inappropriate remarks, including saying that he did not care about "these Italians" in reference to Italian Ph.D. students working in their lab as a part of an international Ph.D. program.

57.     Dr. Tyler has also made other derogatory remarks against Italians directly to Dr. Rastellini and her husband, for example, associating not understanding a situation or stupidity as an "Italian thing."

58.     Some of these remarks were made in the presence of the administrator of the Department, who has agreed that the Chairman's comments were inappropriate.

59.     The remarks and comments made by Dr. Tyler toward Dr. Rastellini violate UTMB's policies and procedures, and they are unlawful.

60.     Dr. Rastellini was asked to provide a summary of her research activities by Dr. Tyler. He expressed his intention to review it during the Christmas holiday of 2014 and discuss with Dr. Rastellini strategies that could help her get funded.

61.     In response to his request, Dr. Rastellini provided two different summaries. However, there was never follow-up discussion from Dr. Tyler.

62.     In a later meeting, he asked Dr. Rastellini what kind of research was her lab conducting, demonstrating that he never even looked at the summaries that Dr. Rastellini had provided to him.

63.     When Dr. Rastellini had received her first evaluation as "does not meet criteria," her former chairman encouraged Dr. Rastellini to increase her teaching activities and her Memorandum of Appointments was modified accordingly with a large percentage assigned to teaching and a much smaller percentage assigned to research.

64.     Since that time, Dr. Rastellini has been teaching many first and second year medical school courses and she became an instructor for the anatomy and the histology labs.

65.     For her teaching activity, Dr. Rastellini has received outstanding reviews from colleagues and students.

66.     In June 2015, Dr. Rastellini was proposed to become part of the Scholar of Education program. However, Dr. Tyler did not support her application.

67.     Dr. Tyler has also engaged in conduct to create an intolerable work atmosphere for Dr. Rastellini.

68.     He has called Dr. Rastellini into what he has said are "urgent meetings" at time that he knew Dr. Rastellini was engaged in teaching classes, demanding to interrupt her teaching and immediately report to him even though there was a previously scheduled time for the meeting to take place that he had cancelled.

69.     He has also offended Dr. Rastellini by making inappropriate comments against her. Dr. Rastellini was accused of being of "no value" to the Department, of being "not user friendly," of being "isolated" and of being a "poor researcher."

70.     There is absolutely no basis for these accusations.

71.     Indeed, Dr. Tyler's comments are contrary to all objective measures of Dr. Rastellini's performance and were made by Dr. Tyler while Dr. Rastellini was having collaborations within her department and with other groups (also outside of UTMB) and while Dr. Rastellini had one NIH RO1 grant in review as co-Principal investigator and numerous presentations in scientific meetings and publications in peer-reviewed scientific journals (ten of which from January though October 2015).

72.     Moreover, while Dr. Tyler was diminishing her research, one of Dr. Rastellini's projects (with her husband Dr. Cicalese) was acknowledged as one of the highlights of UTMB research for that year.

73.     Dr. Tyler has also regularly requested meetings with Dr. Rastellini and her husband together, during which time he attacked and harassed both of them.

74.     Internal departmental grants are bridging funding grants intended to support ongoing research in the department to bridge the laboratory until NIH grants are obtained.

75.     Dr. Tyler was informed about Plaintiffs' new discovery on Alzheimer's disease and that they were given a good chance of obtaining NIH funding of their project by the Program Officer at NIH on resubmission (eliminating part of the original proposal that they felt was not translational) as well as being considered a Nobel prize level discovery by another chairman at UTMB.

76.     Dr. Tyler did not give Plaintiffs any bridging funds at this time, and told them that their research was of poor quality.

77.     However, multi departmental grants were created by Dr. Tyler to encourage inter-departmental collaborations.

78.     Plaintiffs already had various ongoing collaborations with experienced and supported investigators in the institution, and, as a result, they submitted 3 out of 7 total proposals that were submitted in the entire department.

79.     None of Plaintiffs' properly submitted proposals were funded because Dr. Tyler claimed that their proposals were "poor."

80.     Dr. Rastellini was told by Dr. Tyler that she does not publish enough and that her publications are of "poor quality."

81.     Once again, there was no objective basis for Dr. Tyler's statement.

82.     Dr. Rastellini was also told that she should use Dr. Mark Hellmich (a Ph.D. in their department) as a model for successful publications.

83.     However, in 2015, Dr. Rastellini had published more articles with better impact factor than Dr. Hellmich, who is not of Italian descent.

84.     Dr. Rastellini has been asked by Dr. Tyler to relinquish her lab and to stop all of her research.

10

85.     Dr. Rastellini's accounts were then closed preventing Dr. Rastellini from finishing any ongoing experiment and she was ordered to no longer be an independent researcher (despite her being a full professor in a tenure track position).

86.     Instead, Dr. Rastellini was ordered to work for another, less-experienced investigator, Dr. Radhakrishnan, who is not Italian, as a "Ph.D." (Dr. Rastellini is an M.D.) in order to help him develop his career.

87.     Dr. Tyler told her that her survival in the Department would depend on how she "was going to please" Dr. Radhakrishnan.

88.     Despite Dr. Tyler's inappropriate directive, she fully complied with all assigned job duties and responsibilities, and she worked to help Dr. Radhakrishnan set up the equipment to isolate stem cells for his projects.

89.     In addition, she helped one of his residents with animal protocols.

90.     Following these initial accomplishments, Dr. Radhakrishnan refused to meet Dr. Rastellini to discuss further activities despite her numerous requests.

91.     Dr. Tyler has also informed Dr. Rastellini that, despite the fact that she was hired into a tenure track position, she will not receive tenure.

92.     This was done unilaterally by Dr. Tyler and without a formal evaluation of her performance by the tenure committee, despite the fact that Dr. Rastellini has started a new islet transplant program (one of few in the US) in the worse possible conditions (immediately after the devastating Hurricane Ike), and had excellent records in education, research, recognitions and funding.

93.     In addition to many clinical trials and grants received during her tenure, Dr. Rastellini received financial support for the salary of 4 Ph.D. students in her lab (international

Ph.D. program), has an accepted grant with the European Space Agency, and has a pending NIH proposal with a supportive Program Officer.

94.     Other faculty members who are not of Italian origin have obtained tenure at UTMB with much less credentials.

95.     In July 2015, while on vacation, Dr. Rastellini received a letter informing her that her contract will not be renewed and her tenure track position would be terminated in one year.

96.     In an accompanying email, Dr. Tyler stated that he would reconsider if Dr. Rastellini proved herself valuable to Dr. Radhakrishnan and to his success.

97.     In addition, similar to actions taken against her husband, Dr. Rastellini has been stripped of her titles (Director of Transplant Research and Director of Cellular Transplantation) by Dr. Tyler without any official notification from UTMB, which is a violation of UTMB policies and procedures.

98.     Dr. Rastellini has also been denied the opportunities to publish her research when her papers have been accepted for publication.

99.     Dr. Rastellini, along with her husband and another researcher, have made a significant discovery in a research project in which they have been the lead investigators.

100.    This discovery has generated much interest outside UTMB and as a result, a research foundation has promised to make a large donation of $7.5 million to perform a clinical trial and research over the next five years.

101.    As previously described, Plaintiffs also have other NIH and DOD applications pending.

102.    However, Dr. Tyler prevented Dr. Rastellini and her husband from continuing their research and refused to allow them to attend scientific meetings in which this research was presented.

103.    Neither Dr. Rastellini nor her husband have been allowed to continue with their research, and it appears that UTMB intends to block their participation in the Alzheimer's disease project.

104.    The standards for academic research is that the person who does the research and makes the discovery continues with that research.

105.    However, those standards were not followed by UTMB in their case.

106.    In accordance with the notification previously given to her, UTMB subsequently terminated Dr. Rastellini's tenure track position.

107.    Dr. Rastellini was subsequently given a part-time, non-tenure track position at a significantly lower pay rate.

108.    Dr. Cicalese has reported Dr. Tyler's discriminatory and harassing actions to the surgical Administrator, Barbara Petit.

109.    However, no action has been taken to protect Plaintiffs from Dr. Tyler's conduct and Plaintiffs have been subject to further retaliation as a result of the complaints.

**B.**    **Dr. Luca Cicalese**

110.    Dr. Luca Cicalese is a citizen of the United States who was born in Italy.

111.    In 2007, Dr. Cicalese was hired by the University of Texas Medical Branch as a Professor of Surgery with tenure.

112.    As a part of his employment agreement with UTMB, Dr. Cicalese was given an endowment to be the John Sealy Distinguished Chair in Transplantation Surgery.

113.    In addition, Dr. Cicalese's job responsibilities included being the Director of the Transplant and Organ Failure Center.

114.    In his position as Director of this Center, Dr. Cicalese was responsible for the clinical and administrative directorship of the multidisciplinary transplant and organ failure center, as well as development of liver cancer surgery.

115.    Dr. Cicalese reported directly to the transplant board of directors (Dean, CEO, Chairs).

116.    In 2008, Dr. Cicalese became the Director of Hepato-Biliary Surgery, directing liver cancer surgeries.

117.    In approximately 2012, Dr. Cicalese was named the Director of a new International Ph.D. Program.

118.    During his time as Director of the center, Dr. Cicalese made changes to the Transplant Center that steadily improved the existing programs, added new and successful organ transplant programs, and added other research and educational programs including a surgical transplant fellowship.

119.    Dr. Cicalese was viewed by his colleagues at UTMB as an excellent leader and one of the best surgeons in the entire institution.

120.    Dr. Cicalese has been recognized for years by the leadership of the Institution, his peers, and all the Galveston/Houston community for his success in his clinical abilities and accomplishments, as well as for his integrity.

121.    In fact, Dr. Cicalese was asked to perform high-risk operations in difficult patients (cirrhotic) that other surgeons did not feel comfortable performing and to help other surgeons in the operating room when they were in difficulty both of which he did successfully.

14

122.    In approximately October 2012, UTMB hired Dr. Danny Jacobs to be the Provost and Dean of the Medical School.

123.    When they first met, Dr. Jacobs asked Dr. Cicalese and his wife Dr. Rastellini where they were from and when they replied from Italy Dr. Jacobs responded, "What are you doing here? You should go back to Italy."

124.    Almost immediately upon the hiring of Dr. Jacobs, Dr. Cicalese was subjected to different terms of conditions of employment because he is Italian, which have negatively impacted his compensation, and to which physicians who are not Italian have not been similarly subjected.

125.    For example, shortly after Dr. Jacobs was hired, he took several actions designed to directly target Dr. Cicalese for termination.

126.    First, Dr. Jacobs informed Dr. Cicalese that UTMB was suspending the Liver Transplant Program, and that Dr. Cicalese would no longer be needed as the Director of the Center.

127.    The reason given to Dr. Cicalese was that there was insufficient volume to justify maintaining the Liver Transplant Program.

128.    The reason given was false.

129.    First, there were programs with much lower volume that were not suspended or affected, so volume alone could not possibly have been the reason for closing the Liver Transplant Program.

130.    Moreover, Dr. Jacobs, shortly after he started, began a search to hire a new Director of Liver Transplant, demonstrating an actual need for the Program.

131.    In addition, Dr. Jacobs also told Dr. Cicalese that he was initiating an investigation of him for alleged wrongdoing in relation to liver cancer surgeries that Dr. Cicalese had performed.

132.    Dr. Jacobs told Dr. Cicalese that regardless of the outcome of the investigation, Dr. Cicalese's role and responsibilities would not return as they were before.

133.    During that investigation, Dr. Cicalese was prevented from conducting any liver surgeries for approximately six months.

134.    While the investigation was ongoing, it became clear that the investigation was not a legitimate investigation into any wrongdoing on Dr. Cicalese's part, but was simply a sham in order to find any possible grounds to terminate Dr. Cicalese from his tenured position at UTMB.

135.    Upon the conclusion of the investigation, Dr. Cicalese was completely cleared of any wrongdoing.

136.    After the investigation was completed, and Dr. Jacobs was unable to terminate Dr. Cicalese based upon the allegations Dr. Jacobs had raised against him, in October 2014, Dr. Douglas Tyler was hired as the new chairman of surgery.

137.    Dr. Tyler came to UTMB from the same department and institution as Dr. Jacobs had previously been employed.

138.    Since his arrival at UTMB, Dr. Tyler has continued the hostile environment for Dr. Cicalese because he is Italian.

139.    Dr. Tyler has made derogatory and unlawful comments about Dr. Cicalese and other Italians, has engaged in harassment of Dr. Cicalese, and has attacked his accomplishments and marginalized Dr. Cicalese and the work he has done for UTMB.

140.    For example, Dr. Tyler made explicit and inappropriate remarks, including saying that he did not care about "these Italians" in reference to Italian Ph.D. students part of an international Ph.D. program created and directed by Dr. Cicalese and working in his lab.

141.    Dr. Cicalese's wife is also Italian and a professor at UTMB who, until Dr. Tyler's arrival, was expected to receive her evaluation and be granted tenure in 2016.

142.    Dr. Tyler has also made other derogatory remarks against Italians directly to Dr. Cicalese's wife and him, for example associating not understanding a situation or stupidity as an "Italian thing".

143.    Some of these remarks were made in the presence of the administrator of the Department, who has agreed that the Chairman's comments were inappropriate.

144.    The remarks and comments made by Dr. Tyler towards Dr. Cicalese violate UTMB's policies and procedures, and are unlawful.

145.    In addition, upon his arrival at UTMB, Dr. Tyler immediately reduced Dr. Cicalese's salary and created an intolerable work atmosphere.

146.    Dr. Tyler has threatened Dr. Cicalese with the loss of his position for no justifiable reason and has made inappropriate comments, such as "you have a target painted on your back," and saying that he was "like a sore thumb."

147.    Dr. Tyler has threatened to use any excuse to get Dr. Cicalese out of UTMB.

148.    Dr. Tyler explicitly said that Dr. Cicalese's tenure has to be renewed periodically and the next review will not be favorable.

149.    Additionally, Dr. Tyler has limited Dr. Cicalese's surgical duties, for which he is fully trained, and has years of experience and proven successful results.

150.    Dr. Tyler has also told Dr. Cicalese that he will make sure that Dr. Cicalese will never be a liver transplant surgeon again.

151.    Dr. Tyler has instructed Dr. Cicalese to clear with him any liver surgery cases indefinitely, even if Dr. Cicalese is only asked to assist another surgeon who asks for his help.

152.    There was no justification or valid reason to impose these restrictions on Dr. Cicalese's surgeries.

153.    Less experienced surgeons, who are not Italian, who have results worse than Dr. Cicalese's or that require Dr. Cicalese's help, do not have similar restrictions to those placed on Dr. Cicalese.

154.    Moreover, Dr. Cicalese has told Dr. Tyler numerous times that a large number of cases initially referred to Dr. Cicalese are redirected to other doctors.

155.    However, Dr. Tyler said that he is not going to do anything to change it.

156.    Dr. Tyler is using Dr. Cicalese's low volume of surgeries to criticize him for not being clinically productive and to reduce Dr. Cicalese's salary because of his alleged lower productivity.

157.    In addition, and without any official notification, Dr. Cicalese has been stripped of all his titles, Director of Hepato-Biliary surgery, etc., and the corresponding endowment, in violation of UTMB policies and procedures.

158.    Some of these titles have been reassigned to American Doctors who are less qualified than Dr. Cicalese.

159.    Dr. Cicalese has also been denied the opportunities to present his research when his papers have been accepted in scientific meetings.

160.    Even though Dr. Cicalese was limited in his ability to perform surgeries, Dr. Tyler demanded that Dr. Cicalese help increase the number of kidney transplants at UTMB and also that Dr. Cicalese provides any requested assistance to the person who was appointed the interim director.

161.    Dr. Cicalese fully complied with all assigned job duties and responsibilities, and also because of his efforts, the transplant center reached the expected number for the year with Dr. Cicalese doing more transplants than his colleagues.

162.    Even with this clear evidence of Dr. Cicalese's abilities, as well as his willingness to be a team player and provide much needed experience and effort to UTMB, Dr. Tyler continued to tell Dr. Cicalese that he had no value to UTMB.

163.    In February 2015, Dr. Cicalese was informed that Dr. Tyler was representing to the leadership of UT Houston that Dr. Cicalese had been fired from UTMB while Dr. Tyler was visiting to negotiate liver transplant coverage.

164.    Since then, Dr. Cicalese has received no reply from UT Houston to Dr. Cicalese's multiple requests to discuss a job opportunity there, whereas prior to Dr. Tyler's visit, Dr. Cicalese had an excellent relationship directly with the President of that institution.

165.    Dr. Cicalese had also sent job applications to other facilities, and Dr. Tyler told Dr. Cicalese that he had been personally called to inquire about Dr. Cicalese and his job application, specifically referencing an application that Dr. Cicalese had sent to St. Louis, Missouri.

166.    Following Dr. Tyler's statement, Dr. Cicalese never received even a reply from this program or other job inquiries that Dr. Cicalese had made.

167.    One of the conditions of Dr. Cicalese's employment when he was hired at UTMB was that Dr. Cicalese would be provided a valid medical license.

168.    Because Dr. Cicalese's medical school training is from a foreign country, in order to practice medicine in Texas, Dr. Cicalese would be required to take the USMLE exam.

169.    However, for non-Texas licensed medical doctors employed by academic institutions, the institutions can waive this requirement providing a faculty temporary license and this type of license was given to Dr. Cicalese.

170.    Importantly, this license can be renewed indefinitely in Texas and Dr. Cicalese had previously received a permanent waiver at UTMB to practice medicine without having to take the USMLE and obtain a regular Texas State Board of Medicine license.

171.    In July 2015, Dr. Tyler stated that he would not sign the renewal request of Dr. Cicalese's medical license.

172.    Dr. Tyler was informed by the surgical administrator that he had to sign Dr. Cicalese's renewal request since he had been given a permanent waiver.

173.    Dr. Tyler attempted to take this action to prevent Dr. Cicalese from being able to do any clinical work which would further limit Dr. Cicalese's job duties at UTMB.

174.    Immediately thereafter, Dr. Jacobs circulated a memorandum stating that the existing permanent waiver is no longer valid.

175.    Only two physicians had the permanent waiver at UTMB and they are both Italians (Dr. Cicalese and Dr. Vizzeri).

176.    If that action is taken, Dr. Cicalese will not be able to renew his medical license in 2017 and Dr. Tyler told Dr. Cicalese that not having an active license will terminate Dr. Cicalese's tenure and Dr. Cicalese's position at UTMB.

177.    Dr. Cicalese, along with his wife and another researcher, have made a significant discovery in a research project in which they have been the lead investigators.

178.     This discovery has generated much interest also outside UTMB and as a result, a Research Foundation has promised to make a large donation ($7.5 million) to perform a clinical trial research over the next five years.

179.     They also have NIH and DOD grant applications pending that should also provide additional funds for their research.

180.     However, UTMB is taking steps to steal Dr. Cicalese's research by refusing him and his wife access to information on the donation on Alzheimer's disease and only allowing their collaborator (who agreed that they have shared and deserve equal credit for this research) to attend meetings discussing this research.

181.     Dr. Cicalese designed and wrote this clinical trial with Dr. Rastellini and obtained the IRB approval for it (he is the only clinicians among the three investigators) and is the physician planned to provide treatment to these study patients.

182.     Drs. Cicalese and Rastellini were recently informed that the foundation has not taken action on funding the study on UTMB request.

183.     Neither Dr. Cicalese nor his wife have been allowed to continue with their research, and it appears that UTMB intends to block their participation in this Alzheimer's project.

184.     The standards for academic research is that the person who does the research and makes the discovery continues with that research.

185.     The institution is not allowed to sabotage the researcher's professional accomplishments by stealing the research and having someone else take credit.

186.     Dr. Cicalese was recently removed from the directorship of the International Ph.D. program that he had created without any explanation.

187.    Dr. Cicalese has reported Dr. Tyler's discriminatory actions, comments and harassment described above to the surgical Administrator, Barbara Petit.

188.    However, no action has been taken to protect Dr. Cicalese from Dr. Tyler's conduct.

## VI.
## NATIONAL ORIGIN DISCRIMINATION

189.    Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

190.    Plaintiffs are Italian and within a class protected by Title VII.

191.    As described above, Plaintiffs are being subjected to different terms and conditions of employment by Defendant because of their national origin.

192.    Direct and/or circumstantial evidence exists showing that Defendant intended to discriminate against Plaintiffs because of their national origin, in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*

193.    As a result of Defendant's actions, Plaintiffs have suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in the probability will continue to suffer in the future.

194.    Therefore, Plaintiffs seek damages against UTMB for violations of Title VII.

195.    Plaintiffs seek all available damages from Defendant that are allowed under the relevant statutes.

196.    Plaintiffs suffered emotional distress and mental anguish as a result of Defendant's conduct and Plaintiffs seek damages for same.

197.    Plaintiffs also seek economic losses for the lost wages and benefits suffered by her as a result of Defendant's conduct.

198.     Plaintiffs also demand attorney's fees, expert witness fees, pre-judgment and post-judgment interest, costs of court, and any other damages allowed.

## VII.
## DAMAGES

199.     Each and every allegation contained in the foregoing paragraphs are realleged as if fully rewritten herein.

200.     Plaintiffs seek all available damages from Defendant that are allowed under the relevant statutes.

201.     Plaintiffs also seek economic losses for the lost wages and benefits suffered by them as a result of Defendant's conduct.

202.     Plaintiff's also seek equitable relief, including restoration of Plaintiffs' job titles, tenure track, enforcement of previously agreed license waiver, restoration of Plaintiffs' duties and responsibilities, endowments, and compensation schedule;

203.     Plaintiffs have suffered emotional distress and mental anguish as a result of Defendant's conduct and Plaintiffs seek damages for same.

204.     Plaintiffs also demand attorney's fees, expert witness fees, pre-judgment and post-judgment interest, costs of court, and any other damages allowed.

## VIII.
## JURY DEMAND

205.     Plaintiffs request a trial by jury on all issues triable by a jury in this case.

## IX.
## RELIEF REQUESTED

206.     Plaintiffs respectfully pray that they be granted judgment for the following relief:

a.     For actual and compensatory damages for the period of time provided by law, including appropriate backpay or other compensation, and reimbursement for lost pension, insurance, and all other benefits;

b. For equitable relief, including restoration of Plaintiffs' job titles, tenure track, duties and responsibilities, endowments, previously agreed license waiver and compensation schedule;

c. For compensatory damages and other damages as allowed by law;

d. For attorneys' fees;

e. For expert witness fees incurred in the preparation and prosecution of this action;

f. For pre-judgment and post-judgment interest as allowed by law;

g. For costs of court, costs of prosecuting this claim; and

h. For such other and further relief to which Plaintiffs may be entitled under the relevant statutes or justly entitled.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that after trial by jury they be awarded the relief requested above, and any other such further relief whether at law or in equity to which they may show themselves justly entitled.

Respectfully submitted,

CLINE | AHMAD

/s/ Nasim Ahmad
Nasim Ahmad
State Bar No. 24014186
nahmad@cline-ahmad.com
24900 Pitkin, Suite 300
The Woodlands, Texas    77386
Telephone:    (832) 767-3207
Telecopier:    (281) 864-4379

Of Counsel:
Joseph Y. Ahmad
Texas Bar No. 00941100
joeahmad@azalaw.com
AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING P.C.
1221 McKinney Street, Suite 2500
Houston, Texas   77010-2009
Telephone:   (713) 655-1101
Telecopier:   (713) 655-0062

ATTORNEYS FOR PLAINTIFFS
LUCA CICALESE, M.D. AND
CRISTIANA RASTELLINI, M.D.