UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| LUCA CICALESE, M.D., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 3:17-CV-67 |
| | § | |
| THE UNIVERSITY OF TEXAS | § | |
| MEDICAL BRANCH, | § | |
| | § | |
| Defendant. | § | |

## **MEMORANDUM OPINION AND ORDER**

Pending before the Court is a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by the defendant, The University of Texas Medical Branch ("UTMB") (Dkt. 21). The plaintiffs, Dr. Luca Cicalese ("Cicalese") and Dr. Cristiana Rastellini ("Rastellini"), have responded to UTMB's motion (Dkt. 27), and UTMB has filed a reply brief (Dkt. 28). Before UTMB filed its motion, its counsel complied with the Court's pre-motion conference requirement by filing a letter (Dkt. 10) outlining the claimed deficiencies in the plaintiffs' original complaint (Dkt. 1). Among those claimed deficiencies were the same deficiencies discussed in the balance of this opinion, including the plaintiffs' "fail[ure] to identify any comparators outside of their protective [sic] class that are similarly situated that were treated more favorably by UTMB[;]" the plaintiffs' failure to plead more than "conclusory allegations" and "stray isolated remarks" as direct evidence of discriminatory motive; and the plaintiffs' failure "to meet the fourth element of a hostile work environment claim" (Dkt. 10 at pp. 2–3). After the Court held a pre-motion conference (Dkt. 12), Cicalese and Rastellini filed a First

1 / 20

Amended Complaint (Dkt. 15), which is their live complaint. The factual allegations contained in the First Amended Complaint are identical to those contained in the plaintiffs' original complaint; the plaintiffs have simply removed claims for retaliation and claims under the Texas Labor Code (Dkt. 1 at pp. 1–2; Dkt. 15 at pp. 1–2). In their response to UTMB's motion to dismiss, the plaintiffs have not requested another opportunity to replead, and they have made clear that they are standing on their live pleading.

After considering the motion, the response, the reply, all relevant filings, and the applicable law, the Court **GRANTS** UTMB's motion for the reasons set forth below.

## BACKGROUND

This is a case in which two UTMB employees are alleging that they have been subjected to discrimination and a hostile work environment on account of their national origin. Cicalese and Rastellini are husband-and-wife medical doctors who, though now United States citizens, were born in Italy (Dkt. 15 at pp. 3, 13). They frequently collaborate professionally, and they both began working at UTMB in 2007 (Dkt. 15 at pp. 3, 4, 13). Cicalese was hired as a tenured professor of surgery with an endowed chairmanship in transplantation surgery; he was also appointed to a post as the Director of UTMB's Transplant and Organ Failure Center (Dkt. 15 at pp. 13–14). Rastellini was hired in a tenure-track position as a professor of surgery and medicine and was made UTMB's Director of Transplant Research and Director of Cellular Transplantation (Dkt. 15 at p. 3). Neither Cicalese nor Rastellini is licensed to practice medicine in Texas, but UTMB provided them with faculty medical licenses and promised to renew those licenses

(which typically expire) indefinitely, effectively granting the plaintiffs a permanent waiver from the Texas Medical Board's licensure requirement (Dkt. 15 at p. 20).

Judging from the plaintiffs' allegations, things progressed smoothly in their first five years on the job. During that time, Rastellini, a self-professed "leader and pioneer in the field of pancreatic islet transplantation[,] . . . opened a new clinical islet transplant program, established a research lab with multiple successful projects, obtained grants[,] and published numerous papers in peer-reviewed journals" (Dkt. 15 at p. 4). Cicalese similarly flourished, "ma[king] changes to the Transplant Center that steadily improved the existing programs, add[ing] new and successful organ transplant programs, and add[ing] other research and educational programs including a surgical transplant fellowship" (Dkt. 15 at p. 14). Cicalese also became UTMB's Director of Hepatobiliary Surgery in 2008 and created a Ph.D. program for international students in 2012 (Dkt. 15 at pp. 14, 17).

The plaintiffs allege that their relationship with UTMB began to sour when UTMB hired a new Provost and Dean, Dr. Danny Jacobs ("Jacobs"), in "approximately" October of 2012 (Dkt. 15 at pp. 4, 15). According to the plaintiffs' complaint, Jacobs immediately began "harass[ing]" and "target[ing]" the plaintiffs based on their Italian heritage (Dkt. 15 at pp. 4, 15). When he took over, Jacobs changed the criteria used to evaluate Rastellini's job performance so that Rastellini's performance was judged only on her current National Institutes of Health funding—a change that led to Rastellini's receiving the first negative evaluations of her UTMB career (Dkt. 15 at p. 5). Subsequent to the change in evaluation criteria, Jacobs forced Rastellini to move to a new and "inadequate"

laboratory to make room for another researcher, a move that Rastellini alleges was emblematic of Jacobs's general refusal to provide facilities and staff that were sufficient for Rastellini to conduct her research (Dkt. 15 at pp. 5–6). When Rastellini received an "Order of Merit . . . by decree of the President of the Republic of Italy for her career accomplishments," Jacobs trivialized the honor by refusing to publicize it (Dkt. 15 at p. 5). Cicalese fared no better than Rastellini under Jacobs's management: Jacobs suspended UTMB's liver transplant program, fired Cicalese from his position as Director of the Transplant and Organ Failure Center, and initiated an investigation into Cicalese's handling of liver cancer surgeries (Dkt. 15 at pp. 15–16). Cicalese alleges that he was "completely cleared of any wrongdoing" at the conclusion of the investigation and contends that the investigation was a "sham" designed to "find any possible grounds to terminate [him] from his tenured position at UTMB" (Dkt. 15 at p. 16).

The friction between the plaintiffs and UTMB intensified in October of 2014 when Jacobs brought in a former colleague, Dr. Douglas Tyler ("Tyler"), to serve as UTMB's new chairman of surgery (Dkt. 15 at pp. 7, 16). The plaintiffs allege that Tyler immediately joined Jacobs in "creat[ing] a hostile environment" for them (Dkt. 15 at pp. 7, 16). Tyler "marginalized" Rastellini, excluding her from departmental activities such as research task forces and staff candidate interviews—activities in which, being UTMB's Director of Transplant Research and Director of Cellular Transplantation, she had regularly participated prior to Tyler's arrival—and refusing either to provide internal funding for her research or to help her obtain outside funding for it (Dkt. 15 at pp. 7–10). Tyler also personally denigrated Rastellini and her work, saying that she provided "no

value" to UTMB, was "not user friendly," was "isolated," and was a "poor researcher" (Dkt. 15 at p. 9). Ultimately, Rastellini was told to stop all of her research and relinquish her laboratory; was "ordered to work for another, less-experienced" researcher; was stripped of her Director titles; and was demoted to "a part-time, non-tenure track position at a significantly lower pay rate" (Dkt. 15 at pp. 11–13). Cicalese's UTMB career likewise flagged even more drastically upon Tyler's arrival. Tyler reduced Cicalese's salary; instituted a requirement that Cicalese clear any liver surgery cases with Tyler, no matter the circumstances; stripped Cicalese of his Director titles and his endowed chairmanship; removed Cicalese from his position as Director of the International Ph.D. Program that Cicalese had created; told Cicalese that his tenure was not guaranteed and that his next periodic tenure review would be unfavorable; and refused to provide favorable references when Cicalese sought other jobs (Dkt. 15 at pp. 17–19, 22). As he did with Rastellini, Tyler derogated Cicalese as providing "no value" to UTMB; Tyler also warned Cicalese that he "ha[d] a target painted on [his] back" and said that Cicalese "was like a sore thumb" (Dkt. 15 at pp. 17, 19). The plaintiffs further allege that Jacobs and Tyler announced a plan (though the plaintiffs' complaint does not make clear whether that plan came to fruition) to rescind all permanent faculty licensure waivers and require each beneficiary of such a waiver to either obtain a Texas Medical Board license or apply for renewal of the beneficiary's faculty medical license every time that faculty license expired (Dkt. 15 at p. 20). Cicalese and Rastellini claim that the proposed rescission of all permanent licensure waivers was clearly designed to target them

specifically because "[o]nly two physicians had the permanent waiver at UTMB and they are both Italians"—i.e., the plaintiffs (Dkt. 15 at p. 20).

The plaintiffs primarily support their contention that the actions of Jacobs and Tyler were motivated by the plaintiffs' Italian heritage by pointing to occasions on which Jacobs and Tyler allegedly disparaged the plaintiffs for being Italian or disparaged other Italians in the plaintiffs' presence. The plaintiffs allege that, when he first met them just after he was hired, Jacobs said to them, "What are you doing here? You should go back to Italy" (Dkt. 15 at pp. 5, 15). The plaintiffs further allege that Tyler, speaking about Italian Ph.D. students who were participating in Cicalese's International Ph.D. Program, "sa[id] that he did not care about 'these Italians'" (Dkt. 15 at pp. 7, 17). And the plaintiffs claim that Tyler referred to "not understanding a situation or stupidity as an 'Italian thing'" (Dkt. 15 at pp. 8, 17). It is not clear when any of these alleged events took place, although the Court notes that, according to the plaintiffs' complaint, Jacobs was hired in "approximately October 2012" (Dkt. 15 at p. 15). It is also unclear whether Tyler referred to confusion or stupidity as "an Italian thing" on more than one occasion, and if so on how many occasions. The plaintiffs also vaguely refer to disparate treatment at various points in their complaint, for instance by saying that Cicalese's Director titles were "reassigned to American Doctors who are less qualified than Dr. Cicalese" (Dkt. 15 at p. 18).

In their complaint, the plaintiffs ultimately assert that "[d]irect and/or circumstantial evidence exists showing that [UTMB] intended to discriminate against Plaintiffs because of their national origin, in violation of Title VII [of the Civil Rights

Act], 42 U.S.C. §§ 2000e *et seq*" (Dkt. 15 at p. 22). UTMB has moved to dismiss on the basis that the plaintiffs have, on the contrary, failed to allege any facts, direct or circumstantial, suggesting that UTMB's actions were based on the plaintiffs' national origin or that UTMB treated similarly situated employees of other national origins more favorably than it did the plaintiffs (Dkt. 21 at p. 19). The Court agrees with UTMB.

## RULE 12(B)(6) STANDARD OF REVIEW

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests a pleading's compliance with this requirement and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A complaint can be dismissed under Rule 12(b)(6) if its well-pleaded factual allegations, when taken as true and viewed in the light most favorable to the plaintiff, do not state a claim that is plausible on its face. *Amacker v. Renaissance Asset Mgmt., LLC*, 657 F.3d 252, 254 (5th Cir. 2011); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). As the Fifth Circuit has summarized the applicable standard,

> [a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This includes the basic requirement that the facts plausibly establish each required element for each legal claim. However, a complaint is insufficient if it offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action.
> *Coleman v. Sweetin*, 745 F.3d 756, 763–64 (5th Cir. 2014) (quotation marks and citations omitted).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (observing that courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* When considering a motion to dismiss, district courts are "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund*, 594 F.3d at 387.

## ANALYSIS

The plaintiffs' live complaint does not state a facially plausible claim for relief.

### A. The plaintiffs have not stated a claim under Title VII for national origin discrimination.

The plaintiffs contend that UTMB has intentionally discriminated against them with regard to their terms and conditions of employment because they are originally from Italy (Dkt. 15 at p. 22). Disparate treatment based on national origin can be the basis for a

Title VII claim.[1] *See* 42 U.S.C. § 2000e-2(a)(1); *see also Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006). "In such disparate-treatment cases, proof and finding of discriminatory motive is required." *Pacheco*, 448 F.3d at 787; *see also Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548–49 (6th Cir. 1991) ("[T]he aim [of a court that is assessing an alleged Title VII violation] is not to review bad business decisions, or question the soundness of an employer's judgment."). One way to prove discriminatory motive is through direct evidence of that motive, meaning "any statement or written document showing a discriminatory motive on its face." *Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994). Absent direct evidence of discriminatory motive, a plaintiff may meet his or her burden under Title VII by setting out circumstantial proof using the framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework requires a plaintiff making a disparate-treatment claim to establish a prima facie case by showing: (1) that he or she is a member of a protected class; (2) that he or she was qualified for the position at issue; (3) that he or she was subject to an adverse employment action; and (4) that other similarly situated employees who were not members of the same protected class as the plaintiff were treated more favorably than the plaintiff. *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360–61 (5th Cir. 2004).

In 2002, the Supreme Court unanimously stated that the *McDonnell Douglas* framework "is an evidentiary standard [as opposed to] a pleading requirement" and that

---

[1] Cicalese and Rastellini have not pled a disparate-impact theory in their complaint. *See Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006) (explaining the difference between disparate-treatment and disparate-impact discrimination).

"it is not appropriate [under a notice pleading system] to require a plaintiff to plead facts establishing a prima facie case" under *McDonnell Douglas* in order to survive a Rule 12(b)(6) motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002). Some commentators have questioned the vitality of *Swierkiewicz* in light of the Supreme Court's subsequent articulation of the "plausibility" standard in *Twombly* and *Iqbal*.[2] But *Swierkiewicz* has never been explicitly overruled, and *Twombly* even cited it with seeming approval. *See Twombly*, 550 U.S. at 569–70. In the Fifth Circuit, a court that is evaluating a Rule 12(b)(6) motion in a Title VII case can thread the needle between *Swierkiewicz* and the "plausibility" standard by "consider[ing] the *McDonnell Douglas* framework," as long as the court does not enforce the framework as "a rigid pleading requirement." *Puente v. Ridge*, 324 Fed. App'x 423, 427–28 (5th Cir. 2009). Ultimately, "no plaintiff is exempt from her obligation to allege facts sufficient to state all the elements of her claim[,]" *Id.* at 428 (quotation marks omitted), so elements of the *McDonnell Douglas* framework can be used to determine whether the plaintiff has plausibly alleged that the defendant "took the adverse employment action against [the] plaintiff *because of* her protected status[,]" which is "the ultimate question in a Title VII disparate treatment claim[.]" *Raj v. Louisiana State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013) (internal quotation marks omitted; emphasis in original) (affirming dismissal of disparate-treatment claim under Rule 12(b)(6) because the plaintiff's complaint "did not allege any facts, direct or circumstantial, that would suggest [the defendant's] actions

---

[2] For a thorough overview of the various camps that have developed in the debate regarding how to square *Swierkiewicz* with the *Twombly*/*Iqbal* standard, see Charles A. Sullivan, *Plausibly Pleading Employment Discrimination*, 52 Wm. & Mary L. Rev.1613 (2011).

were based on [the plaintiff's] race or national origin or that [the defendant] treated similarly situated employees of other races or national origin more favorably").

The plaintiffs argue that they have adequately alleged both direct and circumstantial evidence of discrimination (Dkt. 27 at pp. 4–7). The Court disagrees.

### i. *The plaintiffs have not alleged facts plausibly establishing circumstantial proof of a discriminatory motive.*

The well-pleaded factual allegations in the plaintiffs' complaint, taken as true and viewed in the light most favorable to the plaintiffs, do not plausibly establish circumstantial proof of a discriminatory motive on UTMB's part. To establish disparate treatment so as to present circumstantial proof of a discriminatory motive, a plaintiff must demonstrate that a "similarly situated" employee outside the plaintiff's protected class was treated differently. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405–06 (5th Cir. 2005). For employees to have been similarly situated, those employees' circumstances "must have been nearly identical." *Perez v. Tex. Dep't of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004) (quotation marks omitted). "As its phrasing 'nearly identical' suggests, the Fifth Circuit narrowly construes the 'similarly situated' requirement." *Silva v. Chertoff*, 512 F. Supp. 2d 792, 803 & n. 33 (W.D. Tex. 2007) (citing cases).[3]

---

[3] The cases cited by Judge Montalvo in footnote 33 of his opinion illustrate how stringent the "similarly situated" requirement is. *See, e.g., Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) (finding insufficiently identical circumstances where the terminated white plaintiff and a black manager who remained employed had the same supervisor, were both company directors, and were both accused of removing company assets at relatively the same time; the Court of Appeals noted that the white plaintiff lied repeatedly during the course of the company's investigation, while the black employee admitted her actions; in addition, the value of the property the black employee removed was "dramatically less" than the property the white plaintiff removed); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (finding that the plaintiff had not shown "nearly identical" circumstances merely because he produced

Cicalese and Rastellini argue that they have pled facts showing that similarly situated employees who were not Italian were treated more favorably than they were; but the plaintiffs have pled no facts showing that their comparators, most of whom are unnamed and all of whom are only vaguely described, were treated differently under nearly identical circumstances. For example, Rastellini alleges that her demotion to a non-tenure-track position was discriminatory because "[o]ther faculty members who are not of Italian origin have obtained tenure at UTMB with much less [sic] credentials" (Dkt. 15 at p. 12). No other description of any of these comparators is given.[4] Similarly,

---

evidence that white and black employees in the same position had scrapped parts due to the employee's operator error or poor workmanship, but were not disciplined; the plaintiff had not shown that the undisciplined employees had, like him, a history of poor work performance and scrapped parts damage amounting to $8,000); *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (concluding that the plaintiff had not shown "nearly identical" circumstances because the employee outside plaintiff's protected class who allegedly received more favorable treatment did not have the same supervisor); *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (determining that the plaintiff and the employee outside her protected class who allegedly received preferential treatment were not similarly situated where the employer discharged the plaintiff because the plaintiff violated its non-fraternization policy and the other employee's conduct did not involve the employer's non-fraternization policy).

[4] Rastellini does specifically name two co-workers as comparators elsewhere in the complaint, but neither comparison involves an adverse employment action. For Title VII discrimination claims, adverse employment actions "include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quotation marks omitted). Rastellini alleges that she "was ordered to work for another, less-experienced investigator, Dr. Radhakrishnan, who is not Italian, as a 'Ph.D.' (Dr. Rastellini is an M.D.) in order to help him develop his career" (Dkt. 15 at p. 11). Rastellini's allegations do not show this order to be anything more than an undesirable work assignment, and "[u]ndesirable work assignments are not adverse employment actions." *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 555 (5th Cir. 1997); *but see Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503–04 (5th Cir. 2014) (pointing out that an employment transfer can qualify as an adverse employment action if the transfer makes the job objectively worse). Rastellini also alleges that Tyler told her "that she d[id] not publish enough and that her publications [we]re of poor quality" (Dkt. 15 at p. 10). Tyler recommended that Rastellini "use Dr. Mark Hellmich (a Ph.D. in their department) as a model for successful publications[,]" a suggestion at which Rastellini took umbrage because she "had published more articles with better impact factor than Dr. Hellmich, who is not of Italian descent" (Dkt. 15 at p. 10).

Cicalese alleges that his own demotion was discriminatory because "[s]ome of [his] Director] titles have been reassigned to American Doctors who are less qualified than [he is]" (Dkt. 15 at p. 18). Cicalese further alleges that Tyler's imposition of a requirement that Cicalese clear any liver surgery cases with Tyler was discriminatory because "[l]ess experienced surgeons, who are not Italian, who have results worse than Dr. Cicalese's or that require Dr. Cicalese's help, do not have similar restrictions to those placed on Dr. Cicalese" (Dkt. 15 at p. 18). Again, no other description of any of these comparators is given. These statements are simply too vague to show that similarly situated employees who were not Italian were treated more favorably than Cicalese and Rastellini were. As a result, the well-pleaded factual allegations in the plaintiffs' complaint, taken as true and viewed in the light most favorable to the plaintiffs, do not plausibly establish circumstantial proof of a discriminatory motive on UTMB's part.

> ii. *The plaintiffs have only pled stray remarks as direct proof of a discriminatory motive.*

In an effort to present direct evidence of discriminatory motive, Cicalese and Rastellini have pled facts showing that Jacobs and Tyler made derogatory remarks about Italians. As discussed earlier, the plaintiffs allege that, when he first met them just after

---

Rastellini's allegations do not show this recommendation to be anything more than, at most, a lower-than-expected job performance review, which in and of itself does not qualify as an adverse employment action. *Mitchell v. Snow*, 326 Fed. App'x 852, 855 (5th Cir. 2009). Even if these actions can be considered adverse employment actions, there are no facts explaining how Rastellini was treated less favorably than Hellmich or Radhakrishnan, neither of whom is mentioned anywhere else in the complaint, under nearly identical circumstances.

he was hired, Jacobs said to them, "What are you doing here? You should go back to Italy" (Dkt. 15 at pp. 5, 15). The plaintiffs further allege that Tyler, speaking about Italian Ph.D. students who were participating in Cicalese's International Ph.D. Program, "sa[id] that he did not care about 'these Italians'" (Dkt. 15 at pp. 7, 17). And the plaintiffs claim that Tyler referred to "not understanding a situation or stupidity as an 'Italian thing'" (Dkt. 15 at pp. 8, 17). It is not clear when any of these alleged events took place, although the Court notes that, according to the plaintiffs' complaint, Jacobs was hired in "approximately October 2012" (Dkt. 15 at p. 15). It is also unclear whether Tyler referred to confusion or stupidity as "an Italian thing" on more than one occasion, and if so on how many occasions. Having taken all of the plaintiffs' allegations into account, the Court concludes that the plaintiffs have not plausibly established that the comments allegedly made by Tyler and Jacobs constitute anything more than "stray remarks," which are not probative of discriminatory intent.

Because Cicalese and Rastellini have not pled facts plausibly showing that UTMB treated similarly situated non-Italian employees more favorably than it did them, the Court will examine the comments allegedly made by Tyler and Jacobs under the four-part test first articulated by the Fifth Circuit in *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996). *See Auguster v. Vermilion Parish School Board*, 249 F.3d 400, 404–05 (5th Cir. 2001) (analyzing workplace comments under the *CSC Logic* test when the plaintiff could not establish circumstantial evidence of discriminatory intent under the *McDonnell Douglas* framework); *see also Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374,

380 (5th Cir. 2010).⁵ Under the *CSC Logic* test, "comments are evidence of discrimination only if they are 1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Jackson*, 602 F.3d at 380. "Comments that do not meet these criteria are considered 'stray remarks,' and standing alone, are insufficient to [constitute evidence of discrimination]." *Id*. (footnote omitted). In order for a protective-class-based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous enough to allow a reasonable factfinder to conclude without any inferences or presumptions that the employee's protected class was a determinative factor in the adverse employment decision. *Wallace v. Methodist Hospital System*, 271 F.3d 212, 222 (5th Cir. 2001). Comments that are vague and remote in time are insufficient to establish discrimination. *Id*.

The comments allegedly made by Tyler and Jacobs are related to Italians, and Tyler and Jacobs possessed the requisite authority to affect employment decisions regarding the plaintiffs. But the comments still fall short of satisfying the *CSC Logic* test. Cicalese and Rastellini do not provide any facts or any timeline showing when any of

---

⁵ Had the plaintiffs sufficiently pled facts establishing that similarly situated non-Italian colleagues were treated more favorably than they were, the Court would have found it appropriate to analyze Tyler's and Jacobs's comments under the more lenient *Russell* test. *See Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (citing *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 226 (5th Cir. 2000)); *see also Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 & n. 14 (5th Cir. 2003) (pointing out that the *Russell* test applies when the plaintiff has established a prima facie case under the *McDonnell Douglas* framework; the defendant has presented a legitimate, nondiscriminatory reason for the adverse employment decision; and the plaintiff has evidence apart from the workplace comments that the defendant's proffered reason for the employment decision was pretextual).

these statements were made; and no temporal link between the statements and any adverse employment action is immediately apparent from the facts pled in the complaint—Cicalese and Rastellini, the Court notes, had been working for UTMB for ten years, had been working with Jacobs for five years, and had been working with Tyler for three years when they filed their amended complaint. Moreover, the comments are not so direct and unambiguous as to allow a reasonable factfinder to conclude without any inferences or presumptions that the plaintiffs' Italian heritage was a determinative factor in any adverse employment action that was taken against them. To the contrary, workplace comments far more direct than those attributed to Jacobs and Tyler have repeatedly been deemed stray remarks. *See Auguster*, 249 F.3d at 404–05 (holding that a supervisor's comment that the employer had had "a problem with past black coaches" and that the supervisor "would do his best to get rid of" the plaintiff "if there was another problem" was a stray remark when it was made nearly a year before the decision not to renew the plaintiff's contract and there was no indication that the comment and the decision were related); *Patel v. Midland Memorial Hospital and Medical Center*, 298 F.3d 333, 343–44 (5th Cir. 2002) (holding that a reference to the plaintiff as a "sand nigger" who "was probably parking his camel" was a stray remark when it was made at least two years before the plaintiff's suspension and there was no indication that the comment and the suspension were related); *Rubinstein v. Administrators of Tulane Educational Fund*, 218 F.3d 392, 400–01 (5th Cir. 2000) (holding that comments that "Jews are thrifty" and that "if 'the Russian Jew' could obtain tenure, then anyone could" were stray remarks when the plaintiff failed to show that the comments were "either

16 / 20

proximate in time to his failure to receive raises or promotions" or "related to the employment decisions at issue").

The facts pled by Cicalese and Rastellini do not show that the comments attributed to Jacobs and Tyler were either proximate in time or related to any adverse employment action taken against the plaintiffs. Rather, the allegations of the plaintiffs' complaint only show "that the comments were, in fact, made[,]" which only establishes that Jacobs and Tyler made stray remarks. *Rubinstein*, 218 F.3d at 401. And stray remarks are not probative of discriminatory intent. *Id*.

At bottom, Cicalese and Rastellini have not pled sufficient facts to plausibly allege that UTMB took any adverse employment actions against them because of their Italian heritage. They have, as a result, failed to state a claim for disparate treatment. *Raj*, 714 F.3d at 331.

### B. The plaintiffs have not stated a hostile work environment claim under Title VII.

Although the plaintiffs do not specifically plead a hostile work environment claim, their complaint states in conclusory fashion that Tyler "created a hostile environment" for Cicalese and Rastellini and that Jacobs "harassed" Rastellini and "target[ed]" Cicalese (Dkt. 15 at pp. 4, 7, 15). As with their disparate treatment claim, Cicalese and Rastellini have failed to plausibly allege a hostile work environment claim.

When the alleged harasser is a supervisor, the elements of a hostile work environment claim based on national origin are: (1) the plaintiff's membership in a protected group; (2) unwelcome harassment; (3) that the harassment was based on the

plaintiff's national origin; and (4) that the harassment affected a term, condition, or privilege of employment. *Alvarado v. Shipley Donut Flour & Supply Co., Inc.*, 526 F. Supp. 2d 746, 757 (S.D. Tex. 2007) (J. Atlas); *see also Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (setting out the materially identical elements of a hostile work environment claim based on race). Harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hernandez*, 670 F.3d at 651 (quotation marks omitted). In determining whether the work environment is hostile, the court must consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. The Supreme Court has emphatically stated that Title VII is not "a general civility code"—"simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and quotation marks omitted). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment," and in order to be actionable under Title VII the "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id*. at 787–88.

Cicalese and Rastellini have not pled sufficient facts to plausibly establish that Jacobs and Tyler subjected them to unwelcome national-origin-based harassment that

was so severe or pervasive as to alter the conditions of the plaintiffs' employment and create an abusive working environment. As discussed above, when they filed their amended complaint, Cicalese and Rastellini had worked for UTMB for ten years, had worked with Jacobs for five, and had worked with Tyler for three. The plaintiffs have pointed to three vague statements about Italy and Italians—one by Jacobs, two by Tyler—made in that time period as evidence of unwelcome harassment based on their Italian heritage that amounted to a change in the terms and conditions of employment. But the statements, standing alone, are not severe enough to constitute "extreme conduct," and Cicalese and Rastellini have pled no facts showing that the comments were anything more than offhand, isolated remarks. *Id.* at 788 (pointing out that "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, . . . jokes, and occasional teasing" are not actionable under a hostile work environment theory); *see also Hernandez*, 670 F.3d at 652 (holding that two incidents of "plainly offensive" conduct, including one incident in which the plaintiff was called a racial slur and another incident in which the plaintiff saw a poster or letter derogating his race, over a decade of employment "would not create a fact issue" that the harassment was sufficiently severe or pervasive to show an abusive working environment); *Lee v. Regional Nutrition Assistance, Inc.*, 471 Fed. App'x 310, 311–12 (5th Cir. 2012) (holding that a coworker's use of a racial slur to refer to the plaintiff and the same coworker's comment that the plaintiff "was too dark to be seen without the benefit of sunlight" were "isolated incidents" that did not state a claim based on a hostile work environment). Cicalese and Rastellini make conclusory allegations that other actions taken by Jacobs and Tyler

stemmed from "harassment" and "targeting," but they have not supported those conclusions with any factual allegations apart from the three stray remarks. *See Hernandez*, 670 F.3d at 654 (noting that incidents of harassment not based on race were not considered where there was no evidence the conduct was a part of a pattern of race-based harassment); *Lee*, 470 Fed. App'x at 311–12 (same). The plaintiffs have failed to state a plausible claim based on a hostile work environment.

## CONCLUSION

Having carefully considered the pleadings, the motion to dismiss, the response, the reply, all relevant filings, and the applicable law, the Court **GRANTS** UTMB's Motion to Dismiss (Dkt. 21). The plaintiffs' claims are **DISMISSED** with prejudice.

**IT IS SO ORDERED.**

**Final judgment will be entered separately.**

**SIGNED at Galveston, Texas, this 22nd day of March, 2018.**

_____
**George C. Hanks Jr.**
**United States District Judge**