United States District Court
Southern District of Texas
**ENTERED**
February 05, 2020
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:17-cv-00067

LUCA CICALESE, M.D. AND CHRISTIANA RASTELLINI, M.D., PLAINTIFFS,

v.

THE UNIVERSITY OF TEXAS MEDICAL BRANCH, DEFENDANT.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

Before the court is The University of Texas Medical Branch's Rule 12(b)(6) motion to dismiss the plaintiffs' second amended complaint. Dkt. 52. Having considered the motion, the response, the reply, all relevant findings, and the applicable law, the court grants in part and denies in part UTMB's motion. More specifically, the motion is granted as to Dr. Luca Cicalese's disparate-treatment claim and denied as to Dr. Cristiana Rastellini's disparate-treatment claim.

## I.   PRIOR PROCEEDINGS

### A.   The plaintiffs' first amended complaint

This is not the first time the court has had occasion to decide whether the plaintiffs' Title VII national-origin-discrimination claims survive a motion to dismiss under Rule 12(b)(6). On March 22, 2018, Judge George C. Hanks, Jr., dismissed the plaintiffs' Title VII discrimination claims—for hostile work

1

environment, disparate impact, and disparate treatment—after determining they had failed to state a claim upon which relief may be granted. *Luca Cicalese, M.D. v. The Univ. of Tex. Med. Branch*, 3:17-CV-67, 2018 WL 1427174 (S.D. Tex. Mar. 22, 2018) (Hanks, J.).

On May 16, 2019, the Fifth Circuit affirmed in part, and vacated and remanded in part, the court's dismissal, remanding only the plaintiffs' disparate-treatment claims:

> While a close call, we conclude that Cicalese and Rastellini—in claiming UTMB's various actions against them were motivated by anti-Italian bias—alleged sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." The district court erred by holding Appellants to a heightened pleading standard. The court's analysis of the complaint's allegations—scrutinizing whether Appellants' fellow employees were really "similarly situated" and whether Jacobs's and Tyler's derogatory statements about Italians amounted to "stray remarks"—was more suited to the summary judgment phase. At this stage of the proceedings, a plaintiff need only plausibly allege facts going to the ultimate elements of the claim to survive a motion to dismiss. On a *de novo* review of Appellants' live complaint, we conclude they surmounted that lower bar.

*Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 768 (5th Cir. 2019) (internal citations omitted).

In reaching its decision, the Fifth Circuit did not address an alternative argument UTMB raised in its motion to dismiss—that the plaintiffs failed to timely exhaust their administrative remedies—instead, remanding the issue back to this court for consideration in the first instance. *Id.* at 768 n.3.

At a status conference on July 19, 2019, UTMB informed the court of its intent to again seek dismissal based upon the plaintiffs' failure to exhaust their

administrative remedies.  Specifically, UTMB argued the plaintiffs' pleadings failed to establish that the complained-of discriminatory events occurred within the 300 days immediately before the date that they filed their charges of discrimination with the Equal Employment Opportunity Commission (EEOC).  Accordingly, UTMB argued, the claims are time-barred.  Because the court's original dismissal order did not address this argument, Judge Hanks determined the issue was ripe for consideration and instructed the plaintiffs to amend their complaint for a second time to include factual allegations establishing (1) they exhausted their administrative remedies and (2) the dates on which the alleged discriminatory conduct occurred.

### B.    The plaintiffs' second amended complaint

Despite Judge Hanks' unambiguous directive, the plaintiffs' second amended complaint is a near duplicate of their first amended complaint, save for the addition of two paragraphs ostensibly discussing whether the plaintiffs exhausted their administrative remedies.[1]  *Compare* Dkt. 15, *with* Dkt. 50.  And while the parties are amply familiar with the allegations at issue, a comprehensive recitation will help address the narrow arguments in UTMB's newest motion to dismiss.

---

[1] In total, the plaintiffs added six paragraphs, as well as a few inconsequential words to their second amended complaint. In addition to the two paragraphs mentioned above, the plaintiffs also include a lone paragraph tying UTMB's alleged restriction of Cicalese's surgical duties to a reduction in his salary, as well as three paragraphs discussing UTMB's alleged decision to hire non-Italian Dr. Jeffrey Fair as its Director of Transplant Surgery in October 2015. *See* Dkt. 50 at 18, 22.

In this case, two UTMB physicians allege they have been discriminated against because of their national origin. Cicalese and Rastellini are husband-and-wife medical doctors who, though now United States citizens, were born in Italy. Dkt. 50 at 3, 14.[2] In 2007, they moved to the United States and both began working at UTMB. *Id.* Cicalese was hired as a tenured professor of surgery with an endowed chairmanship in transplantation surgery; he was also named director of UTMB's Transplant and Organ Failure Center. *Id.* at 14. Rastellini was hired for a tenure-track position as a professor of surgery and medicine and was made UTMB's Director of Transplant Research and Director of Cellular Transplantation. *Id.* at 4. Cicalese is not licensed to practice medicine in Texas, but UTMB provided him with a faculty medical license and promised to renew his license indefinitely, effectively granting Cicalese a permanent waiver from the Texas Medical Board's licensure requirement.[3] *Id.* at 20-21.

According to the plaintiffs' allegations, things progressed smoothly in their first five years on the job. During that time, Rastellini, a self-described "leader and pioneer in the field of pancreatic islet transplantation[,] . . . opened a new clinical islet transplant program, established a research lab with multiple successful projects, obtained grants[,] and published numerous papers in peer-reviewed

---

[2] Page number citations to the documents that the parties have filed refer to those that the court's electronic case filing system automatically assigns.

[3] The court's original dismissal order incorrectly stated: "Neither Cicalese nor Rastellini is licensed to practice medicine in Texas . . ." *Luca Cicalese, M.D*, 3:17-CV-67, 2018 WL 1427174, at *1. However, the plaintiffs' first and second amended complaints do not indicate whether Rastellini has a Texas medical license or whether UTMB ever provided Rastellini with a faculty medical license.

4

journals." *Id.* at 4. Cicalese similarly flourished, "ma[king] changes to the Transplant Center that steadily improved the existing programs, add[ing] new and successful organ transplant programs, and add[ing] other research and educational programs including a surgical transplant fellowship." *Id.* at 14-15. Cicalese also became UTMB's Director of Hepatobiliary Surgery in 2008 and created a Ph.D. program for international students in 2012. *Id.* at 14.

The plaintiffs allege that their relationship with UTMB began to sour when the institution hired a new provost and dean, Dr. Danny Jacobs, in "approximately October 2012." *Id.* at 5, 15. According to the plaintiffs, Jacobs immediately began "harass[ing]" and "target[ing]" the plaintiffs based on their Italian heritage. *Id.* When he took over, Jacobs changed the criteria used to evaluate Rastellini's job performance so that she was judged only on her current National Institutes of Health funding—a change that led to Rastellini's receiving the first negative evaluations of her UTMB career. *Id.* at 5. After the change in evaluation criteria, Jacobs forced Rastellini to move to a new, "inadequate" laboratory to make room for another researcher. *Id.* at 5-6. This move, the plaintiffs allege, was emblematic of Jacobs' general refusal to provide facilities and staff that were sufficient for Rastellini to conduct her research. *Id.* In another instance, when Rastellini received an "Order of Merit . . . by decree of the President of the Republic of Italy for her career accomplishments," Jacobs trivialized the honor by refusing to publicize it, despite "routinely publicly recogniz[ing] other faculty members for similar or even lesser accomplishments . . ." *Id.* at 5.

5

Cicalese claims to have fared no better under Jacobs' management. First, Jacobs suspended UTMB's Liver Transplant Program and removed Cicalese as the Director of the Transplant and Organ Failure Center. *Id.* at 16. Then, Jacobs initiated an investigation into Cicalese's handling of liver-cancer surgeries, purportedly informing Cicalese that "regardless of the outcome of the investigation, [his] role and responsibilities would not return as they were before." *Id.* Cicalese was eventually "completely cleared of any wrongdoing" and contends the investigation was a "sham" designed to "find any possible grounds to terminate [him] from his tenured position at UTMB." *Id.* at 16-17.

The friction between the plaintiffs and UTMB intensified in October 2014 when Jacobs brought in a former colleague, Dr. Douglas Tyler, to serve as UTMB's new Chairman of Surgery. *Id.* at 7, 17. The plaintiffs allege that Tyler immediately joined Jacobs in "creat[ing] a hostile environment" for them because of their Italian heritage. *Id.* According to the plaintiffs, Tyler "marginalized" Rastellini by excluding her from departmental activities such as research task forces and staff-candidate interviews—activities in which, as the Director of Transplant Research and Director of Cellular Transplantation, Rastellini had regularly participated prior to Tyler's arrival—and refusing either to provide internal funding or help her obtain outside funding for her research. *Id.* at 7-10. Tyler also personally denigrated Rastellini and her work, saying that she provided "no value" to UTMB, was "not user[-]friendly," was "isolated," and was a "poor researcher." *Id.* at 9. Ultimately, Rastellini was told to stop all her research and relinquish her

6

laboratory, "ordered to work for another, less-experienced" researcher, stripped of her director titles, and demoted to "a part-time, non-tenure track position at a significantly lower pay rate." *Id.* at 11-12.

Cicalese's UTMB career likewise languished upon Tyler's arrival. The plaintiffs claim Tyler reduced Cicalese's salary; instituted a requirement that Cicalese clear any liver-surgery cases with Tyler, no matter the circumstances; stripped Cicalese of his director titles and his endowed chairmanship; removed Cicalese from his position as Director of the International Ph.D. Program (which Cicalese had created); limited Cicalese's surgical duties, which adversely affected his compensation; told Cicalese that his tenure was not guaranteed and that his next periodic tenure review would be unfavorable; and refused to provide favorable references when Cicalese sought other jobs. *Id.* at 17-20, 22. As with Rastellini, Tyler derogated Cicalese as providing "no value" to UTMB, as well as equating Cicalese to a "sore thumb" and ominously stating Cicalese "ha[d] a target painted on [his] back." *Id.* at 18-19. The plaintiffs further allege that Jacobs and Tyler announced a plan to (1) rescind all permanent faculty licensure waivers and (2) require each beneficiary of such a waiver to either obtain a Texas Medical Board license or apply for renewal of the beneficiary's faculty medical license every time that the faculty license expired.[4] *Id.* at 20-21. The plaintiffs claim the proposed

---

[4] In their second amended complaint, which was filed on July 29, 2019, the plaintiffs allege that this plan "will" occur sometime "in 2017." Dkt. 50 at 21. It is not clear whether the plan ever came to fruition.

rescission of all permanent licensure waivers was designed to target Italians because "[o]nly two physicians had the permanent waiver at UTMB and they are both Italians"—Cicalese and Dr. Vizzeri.[5] *Id.* at 21.

Cicalese and Rastellini primarily support their claims—that the actions of Jacobs and Tyler were motivated by the plaintiffs' Italian heritage—by pointing to occasions when Jacobs and Tyler allegedly disparaged them for being Italian or disparaged other Italians in their presence. The plaintiffs assert that, when Jacobs first met them after being hired, he said to them: "What are you doing here? You should go back to Italy." *Id.* at 5, 15. They further allege that Tyler, speaking about Italian Ph.D. students who were participating in Cicalese's International Ph.D. Program, "sa[id] that he did not care about 'these Italians'" and, at a later date, referred to "not understanding a situation or stupidity as an 'Italian thing.'" *Id.* at 8, 17.

The plaintiffs filed their charges of discrimination with the EEOC on December 17, 2015. Dkt. 52–2 at 1, 7. Accordingly, save for the application of some exception to the statute of limitations, events that occurred more than 300 days before the plaintiffs' filing of their EEOC charges—here, February 20, 2015—are barred by limitations.[6]

---

[5] This is the first and only instance that the plaintiffs refer to Dr. Vizerri in their second amended complaint.

[6] Generally, a plaintiff must file an administrative charge of discrimination within 180 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5(e)(1). In Texas, however, the time to file a charge of discrimination is extended to 300 days after the alleged unlawful employment practice occurred. *See id.*; *Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir. 1998) ("In a state that, like Texas, provides a state or local administrative mechanism to address

At the outset, the court notes that the plaintiffs have done a poor job of specifying precisely when most of the alleged discriminatory acts were committed. For example, it is unclear when Tyler referred to confusion or stupidity as "an 'Italian thing'" or whether it occurred on more than one occasion. *See* Dkt. 50 at 8, 17. Piecing together separate allegations, however, the court can establish that some of the alleged events took place well outside the applicable limitations period.

For example, Jacobs' alleged remark that the plaintiffs "should go back to Italy" occurred when they "first met," which presumably was in or around October 2012. *See id.* at 14-15 ("In approximately October 2012, UTMB hired Dr. Danny Jacobs . . ."). "Almost immediately upon the hiring of Dr. Jacobs," Cicalese claims that he "was subjected to different terms of conditions of employment because he is Italian" that "negatively impacted his compensation" and was removed as Director of the Liver Transplant and Organ Failure Center. *See id.* at 14-16. Cicalese also claims that UTMB "immediately reduced" his salary two years later, when Tyler arrived at UTMB in October 2014. *Id.* at 7, 18. As for UTMB's investigation into Cicalese's liver-cancer surgeries, the court notes that the investigation lasted "approximately six months" and was complete before UTMB hired Tyler in October 2014. *See id.* at 16-17.

On September 13, 2019, UTMB moved to dismiss the plaintiffs' second amended complaint. Dkt. 52. Most of their arguments are foreclosed by the Fifth

---

complaints of employment discrimination, a title VII plaintiff must file a charge of discrimination with the EEOC within 300 days of learning of the conduct alleged.").

Circuit's remand order. However, UTMB's argument that the complained-of events are time-barred and must be dismissed due to the plaintiffs' failure to exhaust their administrative remedies is ripe for consideration.

## II.   LEGAL STANDARD

At the pleading stage for purposes of Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Plausibility, however, will not be found where the complaint "pleads facts that are 'merely consistent with' a defendant's liability" or where the complaint is made up of "'naked assertions devoid of further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Rather, "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (quotation marks, citations, and footnote omitted). When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

Whether the complaint states a valid claim at the pleading stage is viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley*

*Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). Well-pleaded facts of a complaint are accepted as true. *Iqbal*, 556 U.S. at 679 (citation omitted). However, a court is not required to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted); *see Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016) ("Where [a] plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss.") (citations omitted); *see also Mora v. Univ. of Tex. Sw. Med. Ctr.*, 469 F. App'x 295, 299 (5th Cir. 2012) (plaintiff's allegation that she was retaliated against after complaining about the defendant's unwillingness to accommodate her disability was "contradicted by the other facts alleged in the complaint, making the claim implausible on its face").

While a plaintiff is not required to plead a *prima facie* case based on discrimination to survive Rule 12(b)(6), *see Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511–12 (2002), he must set forth allegations that would enable the court to reasonably infer that his employer discriminated against him in violation of Title VII and took the alleged adverse employment action because he is a member of a protected class.

## III.   ANALYSIS

Title VII makes it unlawful for an employer to discharge or otherwise discriminate against any individual "with respect to his compensation, terms,

conditions, or privileges of employment" because of, *inter alia*, an employee's national origin. 42 U.S.C. § 2000e-2(a)(1). This prohibition extends to both intentional discrimination (disparate treatment) and unintentional discrimination (disparate impact). *See, e.g., Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Because the Fifth Circuit affirmed the court's dismissal of the plaintiffs' hostile-work-environment and disparate-impact claims, the only actionable conduct at issue is UTMB's alleged intentional discriminatory conduct.

For purposes of surviving a Rule 12(b)(6) motion, there are two ultimate elements the plaintiffs must plead to support their disparate-treatment claims under Title VII: (1) "an 'adverse employment action,' (2) taken against the plaintiffs '*because of* [their] protected status.'" *Cicalese*, 924 F.3d at 767 (emphasis in original) (quoting *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 576 (5th Cir. 2004)). Thus, the court's analysis begins with determining whether the plaintiffs have pleaded an adverse employment action taken against them because of their protected status. If the court finds the plaintiffs have done so, the court must then determine whether the plaintiffs' claims are subject to dismissal on a separate, independent ground, such as limitations.

**A.    Whether the plaintiffs' disparate-treatment claims satisfy Rule 8's pleading standard**

In its motion to dismiss, UTMB attempts to parse the Fifth Circuit's remand order a little too closely. UTMB argues that, in reaching its decision, the Fifth Circuit did not "address whether the [p]laintiffs pleaded any adverse employment

actions" or "hold that there were sufficient facts that any <u>adverse employment actions</u> were motivated by anti-Italian bias." Dkt. 52 at 11 (emphasis in original). Neither argument is persuasive.

The Fifth Circuit, considering *de novo* the plaintiffs' near-identical first amended complaint, held:

> At this stage of the proceedings, a plaintiff need only plausibly allege facts going to the ultimate elements of the claim to survive a motion to dismiss. On a *de novo* review of Appellants' live complaint, we conclude they surmounted that lower bar.

*Cicalese*, 924 F.3d at 768. In other words, by finding the plaintiffs' first amended complaint satisfied Rule 8's pleading standard—meaning the plaintiffs sufficiently pleaded the "ultimate elements" of a disparate-treatment claim—the Fifth Circuit *did* address "whether the [p]laintiffs pleaded [they suffered] adverse employment actions" and *did* hold that "there were sufficient facts that [the alleged] adverse employment actions were motivated by anti-Italian bias." *See id.* ("While a close call, we conclude that Cicalese and Rastellini—in claiming UTMB's various actions against them were motivated by anti-Italian bias—alleged sufficient facts to 'nudge[ ] their claims across the line from conceivable to plausible.'") (quoting *Twombly*, 550 U.S. at 547).

In fact, UTMB seemingly concedes its first point, acknowledging each plaintiff has at least pleaded that they suffered an adverse employment decision. *See* Dkt. 52 at 13-14 ("[T]he only ultimate employment decisions that the [p]laintiffs pleaded that the Court could consider as an adverse employment action

are: (1) the non-renewal of Rastellini's contract; (2) the reduction of Cicalese's salary; and (3) the loss of titles."); *see also Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447, 453 (5th Cir. 2013) (non-renewal of the plaintiff's employment contract constitutes an adverse employment action); *Garrett v. Judson Indep. Sch. Dist.*, 299 F. App'x 337, 345 (5th Cir. 2008) (same); *Brandon v. Sage Corp.*, 61 F. Supp. 3d 632, 644 (W.D. Tex. 2014) (reduction in pay), *aff'd,* 808 F.3d 266 (5th Cir. 2015); *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 658 (5th Cir. 2002) (demotion), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006); *Sharp v. City of Hous.*, 164 F.3d 923, 933 n.21 (5th Cir. 1999) (same); *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001) (denial of pay increase).

In short, while the court cannot agree that the plaintiffs have "far exceeded their pleading burden," *see* Dkt. 55 at 3, the court must find that they have at least satisfied it. *Russell v. Hathaway*, 423 F. Supp. 833, 835 (N.D. Tex. 1976) ("[W]e are bound by decisions of the United States Court of Appeals for the Fifth Circuit.").

This does not, however, mean that the plaintiffs' claims have survived dismissal.

### B.    Timeliness

For purposes of framing the court's analysis, it is important to remember that the plaintiffs' only live claims are for discrimination based on a disparate-treatment theory. Under this theory, only "ultimate employment decisions" (sometimes referred to as "discrete discriminatory acts")—such as hiring, granting

leave, discharging, promoting, and compensation—qualify as adverse employment actions. *Washington v. Veneman*, 109 F. App'x 685, 689 (5th Cir. 2004) (citation omitted).

A limitations defense supports a Rule 12(b)(6) dismissal when (1) it is evident from the plaintiff's pleadings that the action is barred and (2) the pleadings fail to raise some basis for tolling or the like. *See Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) (citations omitted). If no equitable basis exists to toll limitations, a plaintiff's failure to provide specific dates of discriminatory actions acts as a time bar to these complained-of events. *See Hartz v. Adm'rs of Tulane Educ. Fund*, 275 F. App'x 281, 288 n.3 (5th Cir. 2008).

In Texas, a Title VII plaintiff must file a charge of discrimination with the EEOC within 300 days after the occurrence of the discriminatory conduct. *See* 42 U.S.C. § 2000e-5(e)(1); *Huckabay*, 142 F.3d at 238 ("In a state that, like Texas, provides a state or local administrative mechanism to address complaints of employment discrimination, a title VII plaintiff must file a charge of discrimination with the EEOC within 300 days of learning of the conduct alleged."). Asserting claims of discrete discriminatory acts that fall within the statutory time period will not revive claims for acts that fall outside of the time period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112-13 (2002). Accordingly, save for an equitable exception to the limitations period, Title VII precludes recovery for discrete acts of discrimination that occur outside of the statutory time period because a discrete discriminatory act occurs on the "day it 'happened.'" *Id.* at 110.

Here, the plaintiffs filed their EEOC charges on December 17, 2015. Dkt. 52–2 at 1, 7. Counting back 300 days, the date for determining whether any alleged discrimination is time-barred is February 20, 2015. Therefore, without some exception to extend the statute of limitations, events that occurred before February 20, 2015, are barred by limitations. Because nearly all the complained-of events either objectively occurred outside the limitations period or at a time which the plaintiffs do not identify, it is prudent first to determine whether the plaintiffs' allegations are subject to an equitable exception.

### 1. Continuing violation doctrine

In their response to UTMB's motion to dismiss, the plaintiffs summarily claim that UTMB "ignores the continuing[-]violation doctrine, under which a [p]laintiff may be entitled to recover for acts outside the limitations period if part of a continuing violation." Dkt. 55 at 7.

The continuing-violation doctrine relieves a plaintiff of establishing that all the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001) (citing *Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997)). Nevertheless, "[t]he United States Supreme Court has made clear that the continuing[-]violation doctrine does not apply to discrimination and/or retaliation claims." *Skaggs v. Van Alstyne Indep. Sch. Dist.*, No. 4:16-CV-00227-CAN, 2017 WL 77825, at *6 (E.D. Tex. Jan. 9, 2017) (citing *Morgan*, 536 U.S. at 110-21); *see Heath v. Bd. of*

*Sup'rs for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017), *as revised* (Mar. 13, 2017) ("Claims alleging discrete acts are not subject to the continuing violation doctrine; hostile workplace claims are."); *accord Aguirre v. Valerus Field Sols.*, L.P., CV H-15-3722, 2019 WL 2570069, at *9 (S.D. Tex. Jan. 23, 2019) (Stacey, M.J.) ("[O]nly complaints supporting a hostile work environment claim can withstand a statute of limitations defense under a continuing violation theory."), *report and recommendation adopted*, 4:15-CV-03722, 2019 WL 989413 (S.D. Tex. Mar. 1, 2019) (Hanen, J.), *appeal dismissed sub nom. Onyeri v. Valerus Field Sols.*, L.P., 19-20197, 2019 WL 4673233 (5th Cir. Apr. 23, 2019).

Again, the Fifth Circuit affirmed the court's dismissal of the plaintiffs' hostile-work-environment claims. Thus, to the extent the plaintiffs rely upon acts preceding the February 20, 2015, cut-off date to support their discrimination claims, the court holds the continuing-violation doctrine does not apply. *See Celestine*, 266 F.3d at 352 ("[D]iscrete adverse actions, although racially motivated, cannot be lumped together with the day-to-day pattern of racial harassment and therefore, if otherwise untimely, cannot be saved by the continuing violation doctrine.") (internal citations and quotations omitted); *see also Dotson v. Gulf*, No. CIV.A. H-05-0106, 2006 WL 44071, at *6 (S.D. Tex. Jan. 9, 2006) (Atlas, J.) ("In contrast to a claim alleging a hostile work environment, the continuing[-]violation doctrine does not apply to a claim based on discrete

discriminatory acts such as disparate discipline, dismissals, demotions, failure to hire, or failure to promote.").

### 2. Whether the plaintiffs have alleged that an adverse employment action occurred within the applicable limitations period

Because the continuing-violations doctrine does not apply, events that occurred before February 20, 2015, cannot support a disparate-treatment claim. Despite being given every opportunity to do so, except for the following paragraphs, the plaintiffs have not pleaded facts that would establish *any* of the alleged events—irrespective of whether they are actionable ultimate employment decisions—occurred on or after February 20, 2015:

68.   "In June 2015, Dr. Rastellini was proposed to become part of the Scholar of Education program. However, Dr. Tyler did not support her application.";

97.   "In July 2015, while on vacation, Dr. Rastellini received a letter informing her that her contract will not be renewed and her tenure track position would be terminated in one year.";

98.   "In an accompanying email, Dr. Tyler stated that he would reconsider if Dr. Rastellini proved herself valuable to Dr. Radhakrishnan and to his success.";

108.   "In accordance with the notification previously given to [Rastellini in July 2015], UTMB subsequently terminated Dr. Rastellini's tenure track position.";

109.   "Dr. Rastellini was subsequently given a part-time, non-tenure track position at a significantly lower pay rate.";

166.   "In February 2015, Dr. Cicalese was informed that Dr. Tyler was representing to the leadership of UT Houston that Dr. Cicalese had been fired from UTMB while Dr. Tyler was visiting to negotiate liver transplant coverage.";

167. Since then, "Dr. Cicalese has received no reply from UT Houston to Dr. Cicalese's multiple requests to discuss a job opportunity there, whereas prior to Dr. Tyler's visit, Dr. Cicalese had an excellent relationship directly with the President of that institution.";

169. Following Dr. Tyler's statement, "Dr. Cicalese never received even a reply from this program or other job inquiries that Dr. Cicalese had made.";

174. "In July 2015, Dr. Tyler stated that he would not sign the renewal request of Dr. Cicalese's medical license.";

177. At an unspecified time thereafter, "Dr. Jacobs circulated a memorandum stating that the existing permanent waiver [allowing non-Texas licensed medical doctors employed by UTMB to avoid taking the United States Medical Licensing Examination] is no longer valid.";

179. If UTMB terminates its "existing" permanent waiver practice, Cicalese "will not be able to renew his medical license in 2017 and Dr. Tyler told Dr. Cicalese that not having an active [medical] license will [result in UTMB] terminat[ing] Dr. Cicalese's tenure and [ ] position at UTMB.";

190. "In October 2015, Dr. Tyler informed Dr. Cicalese that Dr. Jeffrey Fair (who is not of Italian descent) will be hired to be the new Director of Transplant Surgery, the title that Dr. Cicalese previously held before it was stripped from him."; and

191. At some point thereafter, "Dr. Cicalesee was also informed that UTMB would be hiring another surgeon to assist Dr. Fair with re-opening the Liver Transplant Program."

*See generally* Dkt. 50.

Regarding Rastellini, the court finds she has pleaded a claim for discrimination based on a disparate-treatment theory that occurred on or after February 20, 2015. As UTMB acknowledges, the non-renewal of Rastellini's contract is an adverse employment action. Dkt. 52 at 13; *see Mooney*, 538 F. App'x

at 453 (non-renewal of the plaintiff's employment contract constitutes an adverse employment action); *Garrett*, 299 F. App'x at 345 (same); *see also Brandon*, 61 F. Supp. 3d at 644 (reduction in pay constitutes an adverse employment action); *Green*, 284 F.3d at 658 (demotion); *Sharp*, 164 F.3d at 933 n.21 (5th Cir. 1999) (same); *Fierros*, 274 F.3d at 194 (denial of pay increase).

At this point in the proceedings, the court declines UTMB's invitation to decide which of Rastellini's individual allegations "constitute adverse employment actions [sufficient] to support a disparate[-]treatment claim under Title VII." Dkt. 52 at 17. Suffice it to say that Rastellini's claim is limited to discrete acts of discrimination contained in the paragraphs identified above.

Cicalese's claim, on the other hand, does not fare as well. Cicalese alleges that in July 2015, Taylor told him he would not sign a renewal request of Cicalese's medical license and, at some time thereafter, UTMB announced its intent to eliminate its permanent-waiver program. Dkt. 50 at 21. But Cicalese does not allege Taylor ever refused to sign his renewal request or that UTMB actually eliminated its permanent-waiver program. Instead, Cicalese claims that if that were to occur, then UTMB "*will terminate*" his position because he "will not be able to renew his medical license *in 2017.*" *Id.* (emphasis added).

While "the operative date from which the limitations period begins to run is the date of notice of the adverse action, not the date the adverse action takes place," *Hartz*, 275 F. App'x at 287, UTMB has established that it did not terminate Cicalese's employment in 2017 and that Cicalese holds a faculty temporary license

20

that is valid through September 15, 2020.[7] The plaintiffs do not address or attempt to rebut UTMB's evidence, nor do they object to UTMB's request that the court take judicial notice of extrinsic evidence when considering its motion to dismiss. *See generally* Dkt. 55.

Notably, "[t]aking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment." *Residents v. Zone*, 260 F. Supp. 3d 738, 757 (S.D. Tex. 2017) (Harmon, J.) (citing *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011), *aff'd* 734 F. App'x. 916 (5th Cir. 2018); *see* Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage in the proceeding."). Moreover, governmental websites are proper sources for judicial notice. *See Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of approval by the National Mediation Board published on the agency's website); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (*per curiam*) (finding no objection to the panel taking judicial notice of Texas agency's website when denying rehearing *en banc*). Thus, a court may take judicial notice of a license that is available on a governmental website without converting a motion to dismiss into a motion for summary judgment. *See, e.g., Bombet v. Donovan*, No. CIV.A. 13-118-

---

[7] UTMB requests the court take judicial notice of Cicalese's active faculty temporary license. Dkt. 52 at 18 n.1. The Texas Medical Board's website allows users to search the status of a physician's medical license, through which the court verified Cicalese's active faculty temporary license. *See* http://www.tmb.state.tx.us/page/look-up-a-license (follow "Click Here to Look Up a License" hyperlink; then search "Cicalese" in the "Last Name or Organization" field; then click the hyperlink associated with license number 46876) (last visited January 29, 2020).

SDD-SC, 2015 WL 65255, at *6 (M.D. La. Jan. 5, 2015). Accordingly, the court judicially notes that Cicalese is still employed by UTMB where he holds an active faculty temporary license.

When considering a Rule 12(b)(6) motion, the court is not required to strain to accept conclusory allegations or unwarranted factual inferences. *R2 Invs. LDC*, 401 F.3d at 642. That includes a plaintiff's allegation that is refuted by a fact of which the court has taken judicial notice. *See Gersten v. Rundle*, 833 F. Supp. 906 (S.D. Fla. 1993) (holding the court does not accept as true facts alleged in a complaint that are internally inconsistent or run counter to facts of which court can take judicial notice), *aff'd*, 56 F.3d 1389 (11th Cir. 1995), *cert. denied*, 516 U.S. 1118 (1996). In light of Cicalese's active faculty temporary license and continued employment at UTMB, the court finds Cicalese's claim that UTMB "will terminate" his position "in 2017" fails to state a claim for discrimination.

The only other possible adverse employment action that occurred on or after February 20, 2015, is UTMB's decision to hire a non-Italian, Fair, as its new Director of Transplant Surgery in October 2015—a title which Cicalese alleges was "stripped from him" in 2012. Dkt. 50 at 22. Cicalese acknowledges that UTMB used the suspension of the Liver Transplant Program due to its "insufficient volume" as its justification for stripping him of the title of director in 2012. But, Cicalese maintains, the subsequent hiring of Fair demonstrates that that justification was pretextual. The pretext became evidence, Cicalese argues, when UTMB allegedly

informed him it "would be hiring another surgeon to assist Dr. Fair with re-opening the Liver Transplant Program." *See id.* at 16, 22.

Yet even accepting as true Cicalese's assertion that he was stripped of his title, by his own account, this occurred "shortly after" UTMB hired Jacobs in "approximately October 2012." *Id.* at 15-16. And Cicalese's own pleadings belie any notion that he first learned that UTMB's stated purpose for terminating its Liver Transplant Program was possibly pretextual in or after October 2015. *Id.* at 16 ("Dr. Jacobs, shortly after he started, began a search to hire a new Director of Liver Transplant, *demonstrating an actual need for the Program*.") (emphasis added).[8]

Accordingly, the court finds that Cicalese has failed to state a claim for discrimination based on disparate treatment that occurred on or after February 20, 2015.[9] *See Hossain v. McHugh*, No. EP-15-CV-00083-KC, 2015 WL 7162022, at *8 (W.D. Tex. Nov. 13, 2015) ("Plaintiff has failed to allege a single adverse employment action that is not time-barred; thus, Plaintiff has failed to state a

---

[8] "Where [a] plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *Carson Optical Inc.*, 202 F. Supp. 3d at 255 (citations omitted); *see also Mora*, 469 F. App'x at 299 (plaintiff's allegation that she was retaliated against after complaining about the defendant's unwillingness to accommodate her disability was "contradicted by the other facts alleged in the complaint, making the claim implausible on its face").

[9] Regarding the allegations in paragraphs 166, 167, and 169, Cicalese only alleges that the complained-of events occurred in February 2015 (paragraph 166) and at an unspecified time thereafter (paragraphs 167 and 169). Even assuming those complained-of events are actionable adverse employment actions, which the court determines they are not, if they occurred before February 20, 2015, then they, too, are time-barred. *See* Dkt. 50 at 20.

plausible claim for relief for disparate treatment under Title VII.") (citing *Pryor v. Wolfe*, 196 F. App'x 260, 263 (5th Cir. 2006)).

***

For the foregoing reasons, the court grants in part and denies in part UTMB's motion to dismiss. The motion is denied as to Rastellini's disparate-treatment claim and granted as to Cicalese's disparate-treatment claim. Accordingly, the court dismisses Cicalese's disparate-treatment claim with prejudice.

Signed on Galveston Island on this 5th day of February, 2020.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE